1841 44 United States of America versus Charles David Snyder oral argument not to exceed 15 minutes per side. Mr. Klein for the defendant appellant. Good afternoon may it please the court my name is John Klein and I represent the appellant Charles David Snyder. I'd like to reserve three minutes for rebuttal. The only disputed element in Mr. Snyder's case and this goes to all counts the tax counts and the embezzlement count was willfulness. The only question was whether Mr. Snyder did what he did willfully or whether he did it in good faith and the district court committed several errors and each of those errors went directly to this sole disputed element in the case. I want to talk first about the errors involving the so-called cognitive note and I'll move on to others if time permits but let me start with that one. The government's theory supporting the admission of this note and later the jury instruction concerning it was that Mr. Snyder had concocted this note shortly before trial so that he would have a trial defense and specifically the government's theory was that Mr. Snyder prevailed upon Mr. Hoke who had loaned him the money to characterize this $300,000 that had been paid over much earlier to characterize it as a loan so that it could be argued at trial that the money was not available to pay the tax and 401k obligations of a TIVA. That was the government's theory. This is one of those situations where there is in fact all of the evidence such as it is is contrary to that theory. For example, Mr. Hoke testified at trial that it was he and his lawyer not Mr. Snyder who came up with the the idea of putting the loan language in the cognitive note. There's no evidence that your client met with Mr. Hoke shortly before these They had a meeting and the purpose of the meeting was Mr. Snyder wanted to borrow $50,000 from Mr. Hoke and in the course of trying to coax $50,000 out of Mr. Hoke, the $300,000 that Mr. Hoke had paid years earlier came into play, had not been repaid. That's correct and so the context of this discussion was Mr. Hoke was Mr. Snyder's need and there's no evidence in the record for why he wanted $50,000 shortly before trial. I think one can surmise why he would want $50,000 shortly before trial. That was the context of the discussion. Mr. Hoke agreed to provide the $50,000. In fact, I think he ended up providing more than that and had his lawyer draw up a document that would support it. That's this cognitive note and it was Mr. Hoke and his lawyer who put in the loan language. So it's not like Mr. Snyder is pushing to call this a loan. He's not. That's Mr. Hoke and his lawyer. They were pushing to, in your theory, Hoke was pushing to have the prior $300,000 characterized as a loan, is that right? To the extent anybody was pushing this, yes, it was Mr. Hoke and his lawyer. It's not like this is something that was extensively discussed or debated. It was simply put into the agreement by Mr. Hoke and his lawyer and Mr. Snyder didn't. Well, isn't the language, isn't some of the testimony a little at least ambiguous, if not contradictory? As I read it, they said yes, it was drafted by Hoke and his lawyers, but they said the wording was pretty much in keeping with what Snyder and I were talking about. And then they said it probably came from me and my attorney as well. Did you discuss the language with Snyder? Well, it came from him as well. I mean, I said it and he said it. Now that's vague or could be taken different ways, but it's rather different from I signed it, sent it to him, and that was the end of it. Am I misquoting any of what I just said? No, you're not. And the testimony which came from Mr. Hoke was somewhat jumbled on this whole point. But what's completely missing is any suggestion that Mr. Snyder was pushing for this loan language. He was not. There is testimony which your honor quoted that... I mean they're talking about the loan language, isn't it? The government asks where did this language come from? And they said, well, I mean I said it and he said it. Which is, you know, doesn't say that, it certainly doesn't say affirmatively that Snyder's the only source, but neither does it say that, oh well, of course my lawyer put it in because we always put that language in. Although later, I think very close to that, when asked where the language came from, I think Mr. Hoke does say that it came from either him or his lawyer. But there's no dispute. Or the other way that the original state, the earlier statement is that, you know, we did it and then on the further examination it gets vaguer. That's the way I read it, but we can look at it. I guess the point I would want to make, your honor, is if the theory here is that Snyder cooked this up so he would have a defensive trial, there is not a shred of evidence to support that. However the loan language might have developed between Snyder and Hoke, there's no suggestion from anybody that Snyder originated it. And beyond that, if the point had been to put this language in this note to have it as a defensive trial, and that's the only way this note would be relevant, you would expect Mr. Snyder to have at least pointed it out to his lawyers. And he didn't. In fact, the evidence is absolutely clear that the first time that his defense lawyers, the people presenting his case in court, ever heard of this note was when the government produced it at trial. And it was a surprise, I think it was a surprise to the government, it was also a surprise to Mr. Snyder's lawyers. Was all of this pointed out during the trial? Objections were certainly made during the trial to the admission of the evidence and to the jury instruction. I think we have laid it out in more detail subsequently, but for example, your honor, just to show that it wasn't like the district court didn't get this, in our bail application, now this is post sentencing, we're trying to keep him out pending appeal, we laid this out exactly the way I'm laying it out to you and much the way we did in our brief, to the district judge. And the district judge rejected the argument, defended the decision to admit the evidence and give the instruction, and the government largely relied on what the district court said in its bail ruling in its brief, and then we responded to that in our reply brief. Am I right that then the assistant, was it Snyder's assistant, also testified and again there was kind of a little back and forth, but which sometimes she thought it was an investment and didn't know when it would became a loan, that sort of thing? Yes, and that goes to a slightly different question, which was certainly much debated at trial, and that is back at the beginning, back at the time the $300,000 was paid over, was it an investment or a loan? And there was testimony both ways, I mean Mr. Hope, for example, testified that he kind of thought of it as a loan, but my argument here today is it doesn't make any difference, that the only way it becomes relevant, the only way it comes in, the only way you get this jury instruction, is if it goes to consciousness of guilt, if Snyder was in fact trying to manufacture a defense by characterizing it as a loan in the 2018 note that he and Mr. Hope signed. It does, but it doesn't depend on that, I mean Myers, well I know that there's a recent unpublished opinion with your honor on the panel, where Myers, that the four inferences in Myers are largely limited to flight, now the other cases from this circuit and certainly the note to the consciousness of guilt instruction, instruction 7.14, doesn't seem to limit it that much, but we don't depend on Myers. I think Myers is a helpful way to look at this kind of evidence, but even if it's simply a question of whether there was evidence to support the instruction without any more precision than that, our argument is the evidence did not support this instruction, even if you draw the inferences in favor of the government, the evidence did not support this instruction and it should not have been given. The evidence shouldn't have been admitted and the instruction should not have been given. And you can choose your own time, but can I ask you about the personal tax parts where the government, there is evidence, there is discussion in the record about the government's witness saying that they were investigating or that your man had not filed his taxes. My question first is just kind of procedurally or factually, was this in play earlier or did the witness just quote blurt it out? And first of all, one of our arguments is it was not in play earlier because the government didn't give notice under 404 B that the personal tax issues that were going to be brought up. So yes, the witness is both on redirect, both government witnesses, both former government employees, one's an agent, the other's a former revenue officer. They both brought it up. And the government's argument is that they put something in their earlier papers, but let's pass that in terms of, I use the word cases in a different context where the government's witness always blurts out that, oh yes, he was on parole when it's not proper. So I'm just trying to see how this came in. That is why was the, did the agent say it at that point? Why was the question asked? What was your feeling there at trial about that? Well, I wasn't at trial, but my sense is that both of these were on redirect. Both were in response to questions from the government, and I guess it's probably best to let the government explain why those questions were asked. But the questions did not specifically ask for personal income tax information, did they? I don't believe they did, Your Honor. So it was, in a sense, the blurting out by the agents. I guess in a sense it was, although... And with respect to Ms. Terry, there was no objection raised by the defendant. And with respect to the other agent, there was an objection to a question that was being asked by the government, which could have been answered yes or no, but then, and that was overruled, but then the agent did give this information about the personal income tax returns not being filed. But then there was no motion to strike. There was no motion to strike, but there had been an objection. I think the government concedes in its brief that that the abuse of discretion standard applies. And then there was nothing else about the personal income tax failure, am I correct, until the comment by the AUSA at closing argument. There was no additional evidence, but it was certainly emphasized in closing argument. Well, emphasized meaning there was was a argument. Yes. Right. Yes. So when you're just looking at what the evidence was, it was just these individual statements by the two agents on redirect. That's correct. That's correct. I see that my time has expired. I don't know whether that includes my rebuttal time or whether... No, it does not. You have the three presentation of personal tax information was sufficient to taint the trial. I'm sorry, Your Honor, I didn't... Yeah, why was this the admission, the statement and then the comment on it at, in closing? Give me a summary of why you think that that was sufficient to have tainted the trial. For this reason, and I will say up front that if the only thing that had come in was the evidence, I probably wouldn't have much of an argument. What happened, though, is that in closing argument, the government linked that evidence to a propensity argument and basically said he's done it before, he's doing it again, and tied that to that directly to the only disputed element in the case, which is Mr. Snyder's willfulness. And I think when you link those things together, you have personal tax information that really is not connected to the issue in the case. It is then linked in closing argument by a propensity argument to the sole disputed question in the case on all counts, not just the tax counts, but on count eight as well. I think you have a real problem with prejudice there. There was no objection raised at the closing argument, though. That's true. The argument is a plain error issue. There's no question about that. Thank you. Good afternoon, and may it please the court. I'm Megan Miller, Assistant U.S. Attorney on behalf of the government. Your Honors, in this case, David Snyder was using the IRS as a bank. Over four years, the evidence demonstrated that he willfully withheld $1.9 million in taxes from his employees. He did not pay that money over to the IRS, but instead used it to pay his company's other creditors and support his own lavish lifestyle. During that time, he also embezzled $130,000 in employee 401k contributions. Mr. Snyder has now raised in his brief and alleges in front of the court today two assignments of error that I tend to first begin with the court's admission of the Cognovant Note between Snyder and Mr. Hoke, and then I will address the admission of the personal income tax statements. Both of these, the court adequately considered and thoroughly addressed after hearing from the parties, and she properly exercised her discretion in making these rulings, and we will ask the court to affirm at the end of the argument. Your Honors, with respect to the Cognovant Note, the court did not abuse its discretion in allowing its admittance, and there are three concepts that underscore why the district court got it right in this particular case, and those concepts are the contradiction. There was a contradiction between the Cognovant Note's characterization of the $300,000 payment as a loan versus other trial testimony that it was an investment. Second, the district court looked at the timing of the Cognovant Note in relation to the government's case, and finally, the permissive nature of the jury instruction that the court gave based on this particular issue. As I understand your opponent's argument, it is that it was this whole Cognovant Note issue was caused by Hoke, not by defendant Snyder. Well, Your Honor, I do agree that there's some ambiguity in Mr. Hoke's testimony about that, but what wasn't ambiguous was the language of the Cognovant Note characterizing the $300,000 payment as a loan, and that contradicted two prior witnesses at trial. Leslie Page, who was Mr. Snyder's personal assistant, she testified that she believed that the $300,000 payment was an investment because she heard it from Mr. Snyder, and she saw an agreement recognizing it as such. And also, Ativo's controller, Irrawaddy Santoso, testified that the $300,000 payment was in fact an investment in Ativo. It matters, Your Honor, because the Cognovant Note described this payment as a loan. As the district court found, this is therefore probative of willfulness. In other words, whether or not the $300,000 payment was an investment in the company, and therefore could have been used to pay the IRS balance. It's a defense. I'm sorry, Your Honor? It's a defense to your case. Yes, Your Honor. And so, doesn't it strike you as odd that the attorney was not even aware of it? Not necessarily, Your Honor, because... I'm struggling with how it would be a defense argued on your behalf in your case, where you're represented by counsel, if counsel is unaware that it exists. Your Honor, and I think that the confusion there lies with Mr. Snyder and his counsel's attempt to equate the consciousness of guilt question with whether or not it's ultimately used as a trial strategy. What goes into the consciousness of guilt inquiry is whether or not there was sufficient evidence of a re-characterization, and whether in light of the immediacy of that, which is something that this circuit has recognized, the immediacy in relation to the government's prosecution. And looking at that timing, the district court found it relevant. I'm still struggling with the underlying concept that if it's going to be a defense, if it's going to be a defense, it has to be put forward in the case and argued as part of a case by counsel. So if he's not told his own counsel, how can it be an intention to change evidence in order to support a claim that you didn't do this willfully? Mr. Snyder was always aware, and the defense was always asserting, that he didn't do this willfully. And one of the primary reasons that he didn't do this willfully, according to the defense, was that he lacked the money to pay. This went so far as for the defense to ask for a jury instruction, talking about the ability of the defense to pay. So this was one aspect that went to the willfulness. Now, I don't know, and the government can't tell what was in Mr. Snyder's mind in doing so, and that's why the case law sets forth the allowance of these inferences. First, to look if there was something that could be deemed a re-characterization. I'm sorry? I'm sorry, I was just coughing. I'm sorry, your honor. I do have a question, but go ahead and finish your sentence. First, to see whether there is a re-characterization. Second, to look at that re-characterization in the timing of the government's case. And notably here, it was two months after he had been indicted, and one month after the government provided notice in its discovery that this was going to be an issue. Which was going to be an issue? When you say this was going to be an issue? Well, that willfulness was going to be an issue generally, and more specifically, that the government intended to suggest that one of the cash infusions going to Ativo during the 2012 time frame was this $300,000 payment from Mr. The note is the timing that in effect the government, you might say, sprang the note at some point during its case in chief? The government only learned of the note at all when Mr. Hoke appeared for trial testimony and literally pulled out of his pocket a note. So conversely, again, this is speculation, but if they had wanted to spring it as a defense, they could have done it during their case. The fact the government raised the note was not impossibly contradictory to Mr. Snyder telling his lawyers, hey, let's pull this note out. Am I right about the trial timing? That is correct on the trial timing. Because you're saying the stuff where you raised willfulness two months before trial, that wasn't with the note. You only knew about the note at trial. That's correct. And one of the things that the government and defense counsel had specifically discussed was the fact that there were cash infusions coming into the company during the 2012 time frame that could have been used to pay the IRS deficiency. And that would be probative of willfulness, whether or not the particular funds were available during that time. And I think that's one of the reasons why the district court reopened this inquiry, precisely because a jury could find that there was a recharacterization of this note. But notably, the district court did not mandate this finding. The inquiry that she allowed and that she further instructed the jury to undertake based on her jury instruction was twofold. First, she left it up to the jury to determine whether there was even a recharacterization at all. Only then, if the juror found that there was a recharacterization, could the juror then decide whether that was evidence of consciousness of guilt. So the admission, in and of itself, of the Cognovant note and the testimony surrounding it was certainly probative from a general relevance standard in that the 2012 time frame went directly to count four, which was the first quarter of 2012, talking about the failure to pay over the funds to the IRS. So this note, which referenced a payment that was made in 2012, spoke precisely to that issue. So it was relevant... To the personal tax law questions, I'm concerned about this 404B issue. When you put in, when you use this as evidence, particularly in the case where it's argued at the conclusion and closing, and I want to make sure I get the statement correct, you heard testimony that the defendant wasn't even paying his own taxes. He'd done it before, and he was doing it this time. That certainly sounds like propensity evidence to me. I'm struggling with the use of this appropriately where it does not seem to me to fit the requirement that you could say that it is a plan or a proceeding that this person undertakes to make it a safe entry of evidence. You've got here three things that don't match. In this one, you've got Snyder, his failure to file, his personal income tax. The comparator that might make it look like propensity evidence is that the other thing that you're comparing it to is Ativo, not Snyder, failure to pay, not to file, an employee's share of FICA. I just think under our Jerkins case that this is not substantial similarity and relevance to the issue here so that you could say that this is appropriate evidence to come in as conduct or pattern or practice. How can you say that this was not just simply propensity evidence? I'd like to answer your Honor's question in two parts. First, I'll address why the personal income taxes are properly considered 404B evidence for this type of crime, and then I'll discuss why the government's statement on closing wasn't propensity. As it relates to the substantial similarity inquiry, this court in Harris in 2006, which is one of the cases that Judge Pearson relied on in her written order permitting the 404B evidence, looked at tax obligations broadly. In that particular case, there was a conspiracy to evade taxes, and the district court allowed in evidence of failure to file corporate taxes, failure to file personal taxes, and found that it was all part of a substantially similar scheme because one, the particular defendant was the responsible party for all of those obligations, which is what we have here. Mr. Snyder was the responsible party for filing his income tax statements, and trial evidence came out that he was also the responsible party for filing Ativo's employment tax statements. Secondly, it's the same victim. It's the same scheme. The other similarity is that you have a failure to file on the part of his personal income taxes, but in Ativos, you don't have that. You have a failure to pay. So why isn't that a distinction? It's not like you are hiding the issue of the tax from the government. In one, you are, personally, I'm not going to tell you what I want made. In the other one, you're saying, here's what's owed. I just don't have the money to do it, but I'm going to tell you what I owe you and what I'm going to try to set aside later on. Those seem to me to be very distinct patterns of conduct. One is intentional hiding. One is full disclosure, except just failing to pay. Your Honor, those are two different means of violating the same statute. One can willfully fail to file, or willfully fail to pay over. And the evidence did support that Ativo both failed to pay over and failed to file for the 2009 tax frame, which was also part of this. It's also part of a general compliance with tax law obligations. And that's, I think, what courts look at. The compliance with tax laws that the IRS sets forth a scheme where one has to file taxes and pay for taxes both personally and as a corporate entity. And when an individual person is responsible for all of those obligations, makes payment to the same victim, and during the same time frame that is relevant to the charges, that is what this court can look at in terms of finding a substantial similarity to the crime at hand. What is the 404B purpose that you think the personal income tax failure to file was relevant to? Again, it was clear from the very beginning that the defendant intended to challenge the indictment on a willfulness ground. And so, in order to establish that he was willful in failing to pay over, these prior instances of non-compliance with tax obligations can demonstrate a lack of mistake, can demonstrate a pattern in practice, and can demonstrate intent. All three of which are proper purposes under 404B for which this type of evidence can be required. This was sort of particularly proper. As I read the record, it wasn't like the government was introducing this initially as a major point. I used the word blurting with your colleagues that it really did seem as though the agents weren't prepped or prompted that they just sort of threw it out there, which undercuts something of the argument that this is a really strong point that the government was going to put in. That's correct, Your Honor. In both instances, for example, beginning with Revenue Officer Terry, she was being asked, why were you looking at the particular corporate shareholders, both Mr. Snyder and Mr. Burmester, in deciding to assess a tax lien? And she had been questioned as to why she was focusing on that. And she came back, and Your Honor, I see my time is about to expire, but may I please leave to continue? She had been asked repeatedly about those particular questions. So the question that she was asked is, why do you, in looking at the company, also look at the corporate individuals who are responsible? And how did that affect your decision in assessing a lien for this corporation? At that time, she responded that Mr. Snyder had been noncompliant with filing 1140s, I'm sorry, 1040s, since she was looking at the record, whereas Mr. Burmester was not, or was. So I think that's important for two reasons. First, it went to correct an impression that a shareholder's personal tax record doesn't affect what the IRS does vis-a-vis a company. And second, looking at this particular answer, which, again, corrects an impression, it also relies on the jury even understanding what a 1040 is. There was no follow-up, there was no particular focus on the personal tax. So I think this singular comment made by Revenue Officer Terry in this particular instance was certainly not plain error. You hadn't, the government hadn't tried to introduce the personal tax matters through a notice that's required for 404B evidence, correct? Your Honor, yes, the 404B notice did not specifically reference personal taxes. However, the note said the government will provide additional authority for this in its trial brief. In its trial brief, the government went through multiple types of tax obligations that could bear on willfulness and that the government may introduce at trial. The district court, when she wrote on the particular issue of allowing these tax obligations in as 404B evidence, did not distinguish amongst any particular type. And it was the defense who specifically challenged those 2009 employment pay over trust fund tax obligations. So when she wrote on the 404B in response to that, she both relied on case law that doesn't differentiate between different tax obligations, and she generally allowed for other tax obligations to come in as evidence of intent. With either of your earlier statements, would a defense attorney have said, oh, we better be prepared to see whether he filed personal income tax or whether he has an excuse? I mean, is there anything of that sort that would have put them on true notice that you better be prepared on that? I didn't read it that way. The government provided both the returns as well as the IRS transcripts during discovery that would have reflected the failure to pay the personal income taxes. I mean, they provided documents, but there was nothing that said affirmatively he didn't file. Just that if you looked at the transcript, you would see that he didn't file. That's correct. And we also marked them as exhibits at trial. The defense did object to them in writing. They objected on prejudicial grounds, but not notice-based. I was going to say that I think one critical thing in this case is the closing argument statement that you heard testimony that defendant wasn't even paying his own taxes. He'd done it before, and he was doing it this time. And why isn't that totally impermissible propensity argument that is harmful? I know there was no objection by the defendant, but it seems that it is saying he didn't pay his taxes before, and he's doing it this time. That seems to be blatant. I think the defense would have this court focus on that one particular statement, but when considering prosecutorial misconduct as it relates to statements such as these, it's important to consider the context. And the context of that statement was made in this way. The government said that willfulness is a contested issue here, and the jury can infer that the defendant was willful for the following three reasons. First, the prosecutor pointed to the way that Mr. Snyder had specifically structured his companies to allow for the payroll function to be taken in-house, and to allow for an international subsidiary that would essentially... To allow for payroll to be taken in-house? Yes, Your Honor. He was fired by the company that was doing it for him. He didn't fire them, right? The testimony was unclear as to who terminated the relationship. The testimony was that they had fronted money for him, and that they weren't going to do it anymore. So they said, we're not going to work with you anymore. And so his only option was that it was now in-house, or he had to pay somebody else to do it. Well, there was certainly testimony that GMS, the payroll company, was frustrated as to the termination of the relationship. I don't think that was clear, but certainly it arose out of the fact that they were floating him money. But there was also testimony from Phil Trem, an employee at Ativo, who said that one of Mr. Snyder's considerations in bringing it in-house versus finding another payroll company was that would give added flexibility in these particular payroll determinations. So that was one of the factors that the government was pointing to the jury to say, this is how Mr. Snyder exercised control over these funds and over the decision to make these payments. The government then moved on to say, you can also know that it's willful because he had done it before. And at that point, the government specifically referenced the 2009 employment tax obligations that the district court had permitted. The prosecutor also said that the court instructed you, just instructed you in the jury instructions, that you can consider this type of evidence for the purpose of proving intent. The prosecutor then referenced another instruction that the court had just given, that no one can know anyone's mind, but rather one can infer intent from the words and natural consequences of a person's action. So this was the framework and the context at which the prosecutor brought up the other tax obligations. Not to suggest that Mr. Snyder was a bad guy who shirked his IRS duties, but based and grounded in record evidence that the defendant had in fact violated other tax obligations, which is admissible circumstantial evidence of willfulness. The prosecutor then continued on with the third reason, looking at Mr. Snyder's own statements in a memo that he wrote, suggesting that in that statement he said, I chose when faced with a decision as to what to do with this money, not to pay the IRS. So within that framework, there isn't a suggestion of propensity. It is rather an overall... I don't think anybody disputes that sort of information. The problem is when you get to the very end of the case and you're closing before the jury and you're saying to the jury, you know, this guy's done it before and this guy's doing it again, have you stepped over the line? And I'm not talking about prosecutorial misconduct. I'm talking about conceptually stepped over the line. And I'm thinking about the Clay case that talks about slim probative value, though some probative value, but a powerful impact on the mind of the juror and that it risks the conclusion of bad character being the basis of the argument. And I'm struggling with why that comment did not then frame bad evidence as simply bad character evidence and propensity evidence. Your Honor, I think that the Clay case is distinguishable. First, in that case, I believe that the court said, even with a limiting instruction, that's not a surefire panacea. Well, certainly we will point out that we did have a limiting instruction and that the jury can be presumed to follow that. But I think what's important about the Clay case is the facts of that particular case. In that case, there was a prior rape that was brought up and it was farther off in time and it was not the same victim. And I believe that in Clay, there was a carjacking victim. And they were trying to say that because this particular person, the defendant had carjacked a person and hit them with a gun and that this person had a prior threatened assault, it was assault, Your Honor, a threatened assault, that this is showing that this person has a propensity to commit crimes that have serious physical harm. And the court said that's going too far. One, because there's no real correlation between one conviction and another conviction as it relates to serious physical harm. The court also looked at the underlying nature of the testimony on the assault where the actual victim came in and said she was afraid that she was going to die that day. And it was that type of statement that was just unduly prejudicial. I think it's very distinguishable, Your Honors, in this case where we do have the same victim being the IRS. We still have the same tax scheme. We have a relevant time frame. We have no, other than the two references and the prosecutor's statement, three sentences out of the entire 2,000 pages of trial transcript that focus on the personal income tax inquiry. And under a plain error standard, Your Honor, I suggest that that is not the type of prejudice in which the Clay court was concerned. Thank you. Thank you. I will talk quickly. Judge Boggs, you raised the possibility that maybe Mr. Snyder was planning to spring this in his defense. But the cognitive note wasn't on the exhibit list, so it probably would have been precluded if that had been the plan. And you would certainly expect his lawyers, at least, to know about it, if that was the plan. And, of course, the lawyers didn't know about it. Turning to the question of the personal tax returns, first of all, notice. The trial brief, like the 404B notice itself, did not give notice of any personal tax issue. It spelled out various things. It did not mention personal taxes. If it had, and Judge Boggs, I think you raised this possibility, in fact, Mr. Snyder had filed returns. He filed them late. But this testimony that the witnesses gave was not, I'm sure it was not intentionally false, but it was not correct. And had he had noticed, he could have pointed that out and probably excluded the evidence entirely. Finally, let me just say on the question of the government's use of this evidence, even if we assume that the witnesses blurted this out and the government had no idea it was coming, the government certainly made use of that evidence in closing. It highlighted that evidence in closing. And it didn't just use the propensity language once. It used it twice at the beginning and at the end of the portion of the argument that we're talking about. I see the page ID reference 3609 where the comment that we've been saying, what else are you referring to? I'm referring to the preceding page, which is 3608. The government began this portion of the argument by saying that Mr. Snyder meant to do what he did. And I believe I'm quoting directly here, so forgive me if I get a word wrong. Quote, and you also know he meant to do it because he did it before. That's how the government began that portion of the argument on page 3508. It then argues for a while, and then on 3509, it wraps up that portion of the argument by saying, he'd done it before, and he was doing it this time. So it starts and ends with that theme. You know he meant to do it because he did it before. That's a propensity argument. Slightly less naked than the second one, but it's a propensity argument. You know he did it this time because he did it before. And then it wraps up that portion of the argument with, he'd done it before, and he was doing it this time, which is almost exactly the language that Johnson explicitly forbids. I believe that was... But that's the argument that this entire passage, 3608 to 3609, is addressing willfulness. And so the purpose is a permitted purpose under 404B. And we cite some cases on this point in our reply brief. It's true that willfulness is a permitted purpose under 404B, but you cannot use 404B evidence to argue willfulness based on a propensity inference. This court, I don't believe, has addressed that question. There's some Seventh Circuit cases, there's a Third Circuit case which we cite, which make exactly that point. That it's very easy for 404B evidence that's addressed to willfulness to slide into propensity. And so in deciding whether 404B evidence comes in based on willfulness, you, the district court, has to make sure that the inferences connecting the 404B evidence and willfulness do not include a propensity inference. So what would you say the government should have said? Well, this evidence shouldn't have come in. I know. Given that it did come in, and basically without an objection on the situation of Terry and with objection to a question but not to the answer in the other guy's case. Let me put it this way, Your Honor. The government could not have connected the personal tax information to willfulness in this case except through a propensity inference. Now, the government certainly could have hidden that propensity inference more craftily than it did. Here we have it laid out on the page for you. The wolf comes as a wolf. And that's pretty unusual. You usually don't see propensity language quite that nakedly put. But there was no way to connect those two things without having a propensity inference, in my view. Thank you. Let's assume that you prevail on one or another of these arguments. Does that have any effect on the ERISA embezzlement claim? It does, Your Honor. The reason it does is that the defense, both the prosecution theory and the evidence and the defense were identical on that count to the evidence and the theory on the tax counts. Here's what I mean by that. All of this happened because this company was in disastrous financial conditions and Mr. Snyder was trying to keep it afloat. That's why the tax payments were late and it's why the ERISA payments were late. His argument throughout was, both as to tax and as to ERISA, I did not act willfully because I had every intention of making these payments. So you're saying the willfulness part of it is identical for both? I mean, it just seems like sometimes you can play a little more games with the government on tax than just taking somebody else's money. The tax instruction has particular language, intentional violation of a known legal duty, but really here, Your Honor, it came to the same thing. It really came to the same thing. Either he took this money and did wrong knowing he was doing wrong or he took it in good faith because he was trying to keep the company afloat and he had every intention of paying it back. That goes equally to the tax and to the ERISA. Thank you. Thank you both for your argument.